1

2

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

May 21, 2024

SEAN F. McAVOY, CLERK

3

4          UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF WASHINGTON

5

6   DEJALENDA S.,[1]                    No.    2:24-cv-0001-EFS

7                      Plaintiff,

8          v.                          **ORDER REVERSING THE ALJ'S
                                       DENIAL OF BENEFITS, AND
9   MARTIN O'MALLEY, Commissioner of   REMANDING FOR MORE
    Social Security,                   PROCEEDINGS**

10

11                     Defendant.

12

13          Plaintiff Dejalenda S. asks the Court to reverse the Administrative Law

14   Judge's (ALJ) denial of Title 2 and Title 16 benefits. Because the ALJ's findings

15   regarding Dr. Uhl's opinion and Plaintiff's symptom reports are not supported by

16   substantial evidence, this matter is remanded for further proceedings.

17                      **I.      Background**

18          Plaintiff applied for benefits under Titles 2 and 16, claiming disability

19   beginning January 2, 2018, based on anxiety, depression, complex post-traumatic

20

21   _____

    [1] For privacy reasons, Plaintiff is referred to by first name and last initial or as

22   "Plaintiff." *See* LCivR 5.2(c).

23

stress disorder (PTSD), and personality disorder.[2] After the agency denied benefits, ALJ Marie Palachuk held a telephone hearing in May 2023, at which Plaintiff and a vocational expert testified.[3]

Plaintiff testified that her daily anxiety and depression, along with her PTSD, makes it difficult to focus, concentrate, and interact with others.[4] She shared that she lived in a number of foster homes as a child, was run over by a vehicle when she was four-years-old, and has been sexually abused.[5] Because of her difficulty interacting with others, she only goes shopping when necessary and prefers to go shopping with another person for emotional support.[6] She has about five anxiety attacks per week, including when she is at the grocery store.[7]  She was hospitalized in October 2019 because her suicidal ideation worsened.[8] She takes medication for her anxiety but her medication makes her feel zombie-like and groggy.[9] She testified that she fixes meals for her 8-year-old son and herself. She

---

[2] AR 207–30.

[3] AR 96–112, 35–51.

[4] AR 39–40.

[5] AR 41.

[6] AR 40.

[7] AR 40–42.

[8] AR 41.

[9] AR 43.

has difficulty showering because showering triggers a difficult childhood memory, and she has difficulty sleeping due to nightmares.[10] She stated that she and her son were living with friends at the moment, but she was trying to find her own housing. While she has her driver's license, she does not own a vehicle.[11]

The ALJ issued a decision denying benefits.[12] The ALJ found Plaintiff's alleged symptoms were "not entirely consistent with the medical evidence and other evidence in the record."[13] The ALJ considered the lay statement from Plaintiff's friend.[14] As to the medical opinion and prior administrative findings, the ALJ found:

- the administrative findings of State agency psychological consultants, Carol Moore, PhD, and Dan Donahue, PhD, persuasive.

---

[10] AR 43–44.

[11] AR 45.

[12] AR 14–34. Per 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[13] AR 24. As recommended by the Ninth Circuit in *Smartt v. Kijakazi*, the ALJ should consider replacing the phrase "not entirely consistent" with "inconsistent." 53 F.4th 489, 499, n.2 (9th Cir. 2022).

[14] AR 25–26.

- the examining psychological opinion of W. Douglas Uhl, PsyD, not persuasive.[15]

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity since January 2, 2018, the alleged onset date; and her date last insured was March 31, 2018.

- Step two: Plaintiff had the following medically determinable severe impairments: major depressive disorder, PTSD, and personality disorder.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to:

  > perform a full range of work at all exertional levels but with the following nonexertional limitations: able to understand, remember, and carry out simple and routine tasks; able to maintain concentration, persistence, and pace on simple, routine tasks for two hour intervals between regularly scheduled breaks; need a predictable environment with seldom change; should have no more than occasional and superficial, meaning non-collaborative, interaction with the public or coworkers; dealing with things rather than people; and working independently.

- Step four: Plaintiff has no past relevant work.

---

[15] AR 26.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as hotel housekeeper, wall cleaner, and hand packager.[16]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[17]

## II.   Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error" and such error impacted the nondisability determination.[18] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[19]

---

[16] AR 17–28.

[17] AR 1–11.

[18] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g); *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[19] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### III.    Analysis

Plaintiff argues the ALJ erred when evaluating Dr. Uhl's opinion and Plaintiff's symptom reports, resulting in an incomplete RFC. The Commissioner argues that the ALJ's nondisability finding is supported by substantial evidence, particularly because Plaintiff had infrequent treatment and unilaterally stopped taking medication for her severe mental impairments, resulting in a self-inflicted deterioration of her symptoms. As is explained below, the ALJ's challenged findings underlying the nondisability decision are not supported by substantial evidence.

### A.    Dr. Uhl's Medical Opinion: Plaintiff establishes consequential error.

Plaintiff argues the ALJ erred by finding Dr. Uhl's marked limitations unpersuasive; whereas the Commissioner argues that the ALJ reasonably evaluated the medical opinion.[20] As is explained below, the ALJ's consideration of Dr. Uhl's opinion is not supported by substantial evidence.

---

court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

[20] The Commissioner also argues that Plaintiff waived any argument that the ALJ erred by finding the State agency psychological findings of Dr. Donahue and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

     1.    <u>Standard</u>

     The ALJ must consider and articulate how persuasive she found each medical opinion and prior administrative medical finding, including whether the medical opinion or finding was consistent with and supported by the record.[21] The factors for evaluating persuasiveness include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[22] Supportability and consistency are the most important factors.[23] When considering the ALJ's findings, the Court is constrained to the reasons and supporting explanation offered by the ALJ.[24]

     2.    <u>Dr. Uhl's examination and opinion</u>

     In December 2020, Dr. Uhl performed a telephonic psychological evaluation of Plaintiff.[25] Dr. Uhl noted that Plaintiff's speech was "very tearful, very

---

Dr. Moore persuasive. However, by challenging the ALJ's evaluation of Dr. Uhl's opinion, which is more limiting that the State agency findings, Plaintiff necessarily challenged the ALJ's decision to find these State agency findings more persuasive.

[21] 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[22] 20 C.F.R. §§ 404.1520c(1)–(5), 416.920c(c)(1)–(5).

[23] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

[24] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

[25] AR 358–68.

emotional," she was orientated and "cooperative but fearful" with depressed and anxious mood and labile affect, she dissociates, she recalled 3 of 5 words after 5 minutes, she answered 6 of 10 questions correctly (which was adequate for her level of education), she had some ability to think abstractly, and she had some insight but she could not take advantage of her insight because she was emotionally fragile.[26] Dr. Uhl diagnosed Plaintiff with PTSD, depersonalization/derealization disorder, reactive attachment disorder, and major depressive disorder (recurrent episode, severe) and opined that Plaintiff was limited as follows:

- moderately limited in her abilities to understand, remember, and persist in tasks by following very short and simple instructions and detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision; perform routine tasks without special supervision; be aware of normal hazards and take appropriate precautions; and ask simple questions or request assistance.

- markedly limited in her abilities to learn new tasks, adapt to changes in a routine work setting, make simple work-related decisions, communicate and perform effectively in a work setting, maintain appropriate behavior in a work setting, set realistic goals and plan independently, and

---

[26] AR 361.

complete a normal workday and workweek without interruptions from

psychologically based symptoms.

Dr. Uhl stated that Plaintiff was unable to work for at least 18 months, should

continue counseling, "patience with her progression would be helpful, she is quite

fragile and may be a possible risk," and that she was "too fragile at this time to

undergo retraining" and thus vocational training or services were not

recommended.[27]

    3.   <u>ALJ's findings</u>

The ALJ was not persuaded by Dr. Uhl's marked limitations because such

1) were not supported by objective medical evidence, instead relying too heavily on

the subjective report of symptoms and limitations provided by Plaintiff, and 2)

were inconsistent with the record as a whole, namely Plaintiff's "sometimes

sporadic treatment and repeated non-compliance, her overall improvement when

compliant with routine and conservative treatment, . . . her discussed activities of

daily living such as her ability to raise her son," and the longitudinal medical

history.[28] Each of the ALJ's reasons for discounting Dr. Uhl's marked limitations

are not supported by substantial evidence.

---

[27] AR 360.

[28] AR 26.

4.    <u>The ALJ erred by finding Dr. Uhl's psychological opinion unsupported because it relied on one-time subjective reports.</u>

The ALJ discounted Dr. Uhl's marked limitations because they were not based on a longitudinal review of Plaintiff's medical history, but a one-time examination based heavily on Plaintiff's self-reported symptoms. It was appropriate for the ALJ to consider whether Dr. Uhl reviewed treatment notes, which he did not, instead only reviewing the DSHS Documentation Request for Medical or Disability Condition. However, an opinion from a psychological examination may not be found unsupported simply because it was based on the claimant's self-reported symptoms which, as is explained below, the ALJ failed to discount for clear and convincing reasons.[29] Moreover, Plaintiff's statements about her psychosocial history and background to Dr. Uhl were consistent with her statements to her therapist and other treating providers. Based on his examination and testing, Dr. Uhl found Plaintiff to be emotionally fragile with tearful/emotional speech, fearful with depressed and anxious mood, labile affect, and limited ability

---

[29] *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (concluding that "the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness"). *See also* 20 C.F.R. §§ 404.1517, 416.917 (requiring that a consultative examiner hired by the SSA be given "any necessary background information about your condition").

to utilize her insight.[30] On this record, without more of an explanation as to why Dr. Uhl's findings during the psychological examination did not support his opinion and were inconsistent with Plaintiff's reported and observed waxing symptoms during therapy and medication-management appointments, the mere fact that his opinion was based on a one-time examination of Plaintiff does not provide substantial evidence to find Dr. Uhl's opinion unsupported.

      5.   <u>Substantial evidence does not support a finding that Plaintiff's mental-health treatment was conservative.</u>

The ALJ's finding that Plaintiff received conservative mental-health treatment is not supported by substantial evidence. Typically, Plaintiff was prescribed Lamictal to assist with her mood swings, olanzapine to assist with her mood disorder/depression/paranoia, and prazosin to assist with her nightmares.[31] These prescribed medications are not over-the-counter medications, and her use was managed on a monthly basis. Her prescribing provider ordered an electrocardiogram to ensure Plaintiff did not have cardiac risks associated with taking the prescribed high-risk medication.[32] In addition to the prescribed medication, Plaintiff participated in mental-health therapy once or twice a month for almost three years, and she was hospitalized for a week in the fall of 2019 due

---

[30] AR 358–62.

[31] *See, e.g.*, AR 938–39, 949–50.

[32] AR 583, 845.

to a mental-health crisis. When considering the overall approach to treating Plaintiff's mental-health disorders, substantial evidence does not support a finding that she was treated conservatively.[33]

6. Substantial evidence does not support the ALJ's finding that Dr. Uhl's opined marked limitations were inconsistent with Plaintiff's improvement "when compliant with routine and conservative treatment."

The ALJ found that Plaintiff improved with routine and conservative treatment. In addition to being based on the erroneous finding that Plaintiff's treatment was conservative, this finding was also based on the ALJ's decision that Plaintiff's symptoms were otherwise stable when she consistently took her medication and was not reacting from negative interactions with others.[34]

These findings are impacted by the ALJ's failure to consider whether Plaintiff's decision to stop taking prescribed medication was impacted by her mental-health impairments, medication side-effects, or her relocation to new towns (and necessary change in medical providers), which is discussed in more detail

---

[33] *See Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (recognizing over-the-counter pain medication as conservative treatment); *Garrison*, 759 F.3d at 1015 n.20 (questioning whether epidural steroid shots to the neck and lower back qualify as conservative medical treatment).

[34] AR 23–24.

DISPOSITIVE ORDER - 12

below. Moreover, the ALJ's summary and analysis of the medical records fails to consider Plaintiff's reports of improvement fairly and fully against her overall symptoms.

For instance, in April 2018, Plaintiff was observed being tired with a depressed and anxious affect (along with moving her legs and in tears) and a mood that was sad, euthymic, and stressed. The treatment provider wrote, "She is not doing well. The PTSD and anxiety is very bad now. I think she needs to get on disability. She cannot function in a job at this time. She needs to have some assistance. I fear for her safety otherwise."[35] Six months later, Plaintiff was observed with intermittent eye contact, tearfulness, and suicidal ideation.[36] In January 2019, she was observed as less distressed.[37] During a behavioral-health initial assessment in April 2019, Plaintiff was observed as anxious and tearful.[38] Plaintiff began attending mental-health therapy appointments and medication-management appointments at least once a month; records from a few of these appointments reflect:

- June 11, 2019: "distraught regarding problems with a neighbor. She expressed fear, anxiety and feelings of being completely

---

[35] AR 663.

[36] AR 336.

[37] AR 308.

[38] AR 370.

overwhelmed. . . . was tearful, angry, and hurt. . . . She has few

coping skills to deal with situations where she feels threatened or if

she feels her son may be at risk."[39]

- July 17, 2019: "Client demonstrated anger and frustration most of

  this session. She was suspicious of any person she mentioned. . . . She

  was tearful throughout. Her thoughts appeared tangential and

  fragmented."[40]

- August 22, 2019: "client is tearful, describes feeling overwhelmed

  regarding expectations of volunteer work for the senior center related

  to DSHS. . . . Orientated x3, speech is normal rate/tone, eye contact

  good. Affect is tearful but calms, mood mildly anxious, denies

  depression, denies [suicidal ideation] or thoughts or feelings of harm

  to self or others. There is no evidence of psychosis. Memory, focus,

  and fund of knowledge is [within normal limits]. Judgement and

  insight is fair."[41]

---

[39] AR 556.

[40] AR 550.

[41] AR 594.

- Sept. 24, 2019: "alert and orientated X's 3. Her thoughts were organized and logical . . . was tearful as described three situations where her feelings of abandonment and abuse was triggered."[42]

In October 2019, she presented as tearful, disheveled, hyperactive, agitated, sad, labile, and anxious with impaired attention and a tremor and she was punching her legs.[43] She had been volunteering about ten hours a week as required by the State in order to receive State benefits.[44] A couple days later Plaintiff asked to be voluntarily hospitalized because she was concerned about self-harm.[45] During admission, she presented with heightened symptoms of severe depression and anxious mood with active suicidal ideation.[46]

She was released in about a week, and she resumed therapy sessions on at least a monthly basis and monthly medication-management appointments. During the November 2019 therapy session, Plaintiff's speech was slow, she was tearful

---

[42] AR 544.

[43] AR 836.

[44] AR 836, 542 ("She feels the hours of her volunteer job is causing her to feel overwhelmed and feel that she can't handle to [sic] stress of it although DSHS won't budge on the [15] hours [per week] because of the TANF rules.").

[45] AR 599–602, 614; *see also* AR 611 (noting that Plaintiff "saw her sexual abuser at a store which triggered her PTSD which led to hospitalization").

[46] AR 599–601, 614, 1004–27, 1012.

throughout the session, but she was not observed with psychomotor agitation.[47] During the February 2020 medication-management appointment, Plaintiff appeared fatigued with an apathetic mood and constricted affect.[48]

In April 2020, Plaintiff appeared at her medication-management appointment as sad, tearful, and apathetic and reported that she stopped taking her medications four days prior because "she didn't like how they made her feel numb and less creative."[49] Although she continued with her therapy sessions, she did not take mental-health medication until October 2020.

During a mental-health appointment with Dr. Alana Jackson on October 15, 2020, Plaintiff had a panic attack in the examination room, cried frequently during the examination, and had a flat affect.[50] Dr. Jackson referred Plaintiff to urgent collaborative care.[51] The next day, Plaintiff met with Timothy Day, PhD, who observed Plaintiff with euthymic mood and full-range affect, cooperative, and socially interactive with logical thought process. Based on Plaintiff's reported difficulty struggling with mania, depression, and anxious distress, Dr. Day

---

[47] AR 532.

[48] AR 823.

[49] AR 811–14.

[50] AR 653–55.

[51] AR 652–55.

recommended that Plaintiff seek specialty psychiatric care to evaluate medications.[52]

Days later, Plaintiff met for an initial psychiatric evaluation with ARNP Caitlin McIntyre, during which she was observed with restless motor activity, intact thought process, normal attention and concentration, adequate insight, and intact memory. ARNP McIntyre noted that Plaintiff "demonstrates hallmark symptoms of mood lability, chronic feelings of emptiness, low self-worth, chronic [suicidal ideation], history of self-harm behavior and difficulty in interpersonal relationships. . . . She is open to starting on a medication to manage symptoms . . . [of] mood lability and reactivity."[53] She was given a one-month supply of Lamictal.

Plaintiff resumed mental-health therapy sessions.[54] In December 2020, her therapist Lisa Orr, LMHC, encouraged Plaintiff to "establish care with a medical provider and consider medications to alleviate nightmares."[55] It was not until May 2021, following a sexual assault earlier that spring that Plaintiff regularly resumed Lamictal.[56] She then continued with Lamictal and prazosin, along with monthly

---

[52] AR 650–52.

[53] AR 644–49.

[54] AR 415–57, 630–33.

[55] AR 467.

[56] AR 630.

medication-management appointments until May 2022, and therapy sessions at least once or twice a month through January 2022.[57]

During her medication-management appointment in July 2021, Plaintiff was observed with excessive and loud speech and an irritable and angry affect.[58] Later that month, Plaintiff was irritable and tearful at her therapy appointment.[59] During her therapy appointment in August 2021, she discussed that she yelled at a man when shopping at Walmart.[60] During her medication-management appointment in August 2021, she had an anxious mood, congruent affect, tangential thought process, and paranoia.[61] During the therapy session on the same date, she was tearful and struggled with reactivity.[62] During her medication-management appointment in September 2021, she reported that she was doing "okay" and she was observed with an anxious mood and congruent affect while having a linear thought process and interactive social contact.[63] During the next month's appointment, she again reported that she was doing okay but that she had

---

[57] *See, e.g.*, AR 384–98, 604–21, 749–50, 746–48, 754–89, 882–91, 948–70.

[58] AR 621–23.

[59] AR 384–87.

[60] AR 788.

[61] AR 746–47.

[62] AR 782.

[63] AR 744–45.

some bad drowsiness the last week, and she was observed as anxious with paranoid thought content.[64] During her therapy session in November 2021, she was tearful, worried, and anxious over another report to CPS.[65] During her medication-management appointment that same month, she stated "[I] honestly feel like I'm doing really well. I'm not attacking people no matter how much I hate them," but she was having more nightmares, woke up feeling rattled, would become tearful; she was observed with a euthymic mood, congruent affect, appropriate thought content, and logical and linear thought process.[66] The therapist commented in the December 2021 notes that Plaintiff's emotional dysregulation and emotional unavailability impacted her son.[67]

The therapy and medication-management notes from January to April 2022 reflect that although Plaintiff would report doing good at times, she also reported feeling stressed, having lost her temper with her son, being angry at her sister, and was observed as anxious and pacing at one appointment, although at another appointment the provider noted that Plaintiff's "mood does not impair her ability to communicate today."[68]

---

[64] AR 742–43.

[65] AR 756–57.

[66] AR 1002–03.

[67] AR 884–87.

[68] AR 991; *see also* AR 882–83, 952–54, 969–96, 970–71.

In May 2022, she advised her provider that she was moving to Nevada with her son and wanted to taper off medications that cause sun sensitivity.[69] Although her provider stated that the medications could be continued with sunscreen use, Plaintiff advised she wanted to taper off her medications. Nonetheless, the provider prescribed medication for three months so Plaintiff would have time to find a new provider in Nevada.[70] Within two months, Plaintiff returned to Washington because the move to Nevada had not been safe for her and her son. Plaintiff was observed as being in acute distress with anxious mood, tearfulness, and suicidal ideation.[71] Prazosin and olanzapine was re-prescribed but Lamictal was not resumed until the next month.[72]

The most recent medical record shows that Plaintiff continued to take medications as prescribed through March 2023.[73] During the March 2023 appointment, Plaintiff was observed with labile mood, rapid fluctuation of mood, anxiousness, sadness, tearfulness, and suicidal ideation.[74] She reported that although therapy assisted with coping skills and insight and that medication

---

[69] AR 948–50.

[70] AR 948.

[71] AR 936–38.

[72] AR 924–25, 938.

[73] AR 1052.

[74] AR 1053–54.

helped with hallucinations she was still struggling with PTSD symptoms, especially labile mood, chronic passive suicidal ideations, irritability, and hypervigilance/anxiety.

During the hearing, Plaintiff testified that she still takes mental-health medication, but her medication makes her "zombie-like and super groggy."[75]

On this record, the ALJ's finding that Dr. Uhl's marked limitations were inconsistent with Plaintiff's improvement with routine and conservative treatment is not supported by substantial evidence. The ALJ gave undue weight to the fact that Plaintiff's symptoms were generally heightened during the year that she was not taking medication, without considering whether medication side-effects, Plaintiff's mental disorders, or her relocations contributed to her stopping psychotropic medication. Moreover, Plaintiff's symptoms remained troublesome notwithstanding periods of improvement. For instance, even after resuming medication for about a nine-month period spanning 2022–23 and attending monthly medication-management appointments during that time, Plaintiff was observed with waxing symptoms during her March 2023 psychotherapeutic appointment.[76] Without fairly and fully considering the context of Plaintiff's

---

[75] AR 43.

[76] The State agency psychological consultants reviewed the medical records available at the time they reviewed the file in September 2021 and December 2021,

reports of improved symptoms, the ALJ's finding that Plaintiff's symptoms

improved to an extent that they were inconsistent with Dr. Uhl's marked

limitations is not supported by substantial evidence.[77]

7.    <u>The ALJ erred by not considering the reasons why Plaintiff stopped
      taking her mental-health medication.</u>

The ALJ found Dr. Uhl's opined marked limitations inconsistent with

Plaintiff's "repeated [medication] non-compliance."[78] However, "the mentally ill

[are not to be punished] for occasionally going off their medication when the record

affords compelling reason to view such departures from prescribed treatment as

part of claimants' underlying mental afflictions."[79] Therefore, the ALJ "must not

_____

respectfully. They did not have the opportunity to review the medical records

prepared after those dates.

[77] *See Attmore v. Colvin*, 827 F.3d 872, 878 (9th Cir. 2016) ("It is the nature

of bipolar disorder that symptoms wax and wane over time."); *Garrison v. Colvin*,

759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating

symptoms are a common occurrence, and in such circumstances it is error for an

ALJ to pick out a few isolated instances of improvement over a period of months or

years and to treat them as a basis for concluding a claimant is capable of

working.").

[78] AR 26.

[79] *Garrison*, 759 F.3d at 1018 n.24.

draw any inferences about an individual's symptoms and their functional effects

from a failure to seek or pursue regular medical treatment without first

considering any explanations that the individual may provide, or other information

in the case record, that may explain infrequent or irregular medical visits or failure

to seek medical treatment[.]"[80]

Here, Plaintiff stopped taking her medication for about one year beginning

in the spring of 2020. At that time, Plaintiff told her provider that she stopped

taking her medications days prior because they made her feel numb and less

creative.[81] The ALJ did not consider whether these side-effects were a good reason

for Plaintiff to discontinue the medication.[82] Likewise, the ALJ did not consider

whether Plaintiff's mental-health impairments impacted her decision to

discontinue and/or not resume medication when recommended to do so by her

providers.[83] As the Ninth Circuit has highlighted, "it is a questionable practice to

chastise one with a mental impairment for the exercise of poor judgment in seeking

---

[80] *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) (quoting SSR 96–7p at 7–8).

[81] AR 811–13.

[82] *See* SSR 16-3p (explaining that "[a]n individual may not agree to take

prescription medications because the side effects are less tolerable than the

symptoms").

[83] *See, e.g.,* AR 644–52, 467.

1   rehabilitation."[84] On this record, by not considering whether Plaintiff had good

2   cause for discontinuing her medication, the ALJ erred when she found Dr. Uhl's

3   opinion inconsistent with Plaintiff's "repeated [medication] non-compliance."

4           8.    <u>Substantial evidence does not support the finding that Plaintiff's</u>

5                 <u>mental-health treatment was sporadic.</u>

6           The ALJ appropriately considered whether Dr. Uhl's opinion was consistent

7   with the mental-health treatment that Plaintiff received. However, when the

8   record is considered fully and fairly, substantial evidence does not support the

9   ALJ's finding that Plaintiff's mental-health treatment was sporadic.

10          Although Plaintiff was slow to engage in mental-health treatment after first

11  seeking treatment in the spring of 2018, she participated in mental-health therapy

12  at least once a month from October 2018 to January 2019.[85] Then due to moving to

13  a new town, her mental-health therapy was paused until she resumed therapy in

14  April 2019. She began monthly medication-management appointments in June

15  2019.[86] In October 2019, she had a mental-health crisis and sought voluntary

16  hospitalization for about a week.[87] After release, she resumed therapy sessions on

---

[84] *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (internal quotations and
citation omitted).

[85] *See, e.g.*, AR 308–21, 332, 572, 661, 664.

[86] *See, e.g.,* AR 544–63, 566–67, 586–95, 793, 853, 844–48.

[87] AR 599–601, 614, 1004–27.

at least a monthly basis and monthly medication-management appointments until April 2020 when she told her treating provider that she stopped taking her medications because "she didn't like how they made her feel numb and less creative."[88] Although she continued with her therapy sessions, she did not take mental-health medication until October 2020, at which time she took medication for about one month. Then in May 2021, she began regularly taking mental-health medication and attending monthly medication-management appointments, except for a one-month period during the summer of 2022 when she moved to Nevada for a short period. [89] She continued with her therapy sessions, at least two times a month until January 2022 when she graduated from therapy.[90] The therapy discharge notes state that Plaintiff met 75% of her stated goals/needs: "Client realized that medication compliance and regular contact with prescriber has helped her manage nightmares, mood dysregulation and decreased anxiety."[91]

---

[88] AR 521–40, 580–83, 811–32.

[89] *See, e.g.,* AR 621–22, 632–34, 644–49, 936–50, 949–51, 953–56, 969–72, 996–98.

[90] *See, e.g.*, AR 384–86, AR 489–518, 754–88, 882–90.

[91] AR 891 (cleaned up).

After "graduating" from therapy, Plaintiff continued attending monthly medication-management appointments.[92] In December 2023, Plaintiff advised that she wanted to see a counselor again. The provider noted:

> Patient better fit for outpatient individual psychotherapy given the severity of her symptoms. Referral placed to ABH. I believe she would benefit from dialectical behavior therapy and eye movement desensitization and reprocessing modalities. Chelsey Craven LSWAIC would be a good fit if available. Patient informed that there is a significant wait list at this time.[93]

The ALJ failed to explain how this record reflects sporadic mental-health treatment. Although Plaintiff initially delayed for about six months in participating in regular therapy, Plaintiff engaged in individual therapy sessions for three years. The ALJ did not address whether Plaintiff's mental impairments contributed to her initial delay in participating in treatment, and three years of regular therapy sessions is not sporadic treatment.[94] Also, although Plaintiff

---

[92] AR 905 (She would benefit from [dialectical behavioral therapy]. Unfortunately, this group shut down through CH. She was seeing an individual therapist through OBHC. She has since graduated."); AR 937, 950, 955, 970, 990.

[93] AR 1054 (cleaned up).

[94] *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("[T]he fact that claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that Dr. Brown's assessment of claimant's condition is inaccurate.").

(mostly) stopped taking mental-health medication from April 2020 to May 2021 and then again during her short move to Nevada in June 2022, she otherwise took her mental-health medication when prescribed during the relevant period and attended the monthly medication-management appointments.

Thus, Plaintiff took prescribed mental-health medication for almost 3 years (spring 2019–20 and spring 2021–23) and attended the monthly medication-management appointments during those periods. Substantial evidence does not support a finding that this is sporadic treatment. Moreover, by not considering whether Plaintiff stopped taking mental-health medication because of medication side-effects or relocations or whether her mental impairments contributed to her decision to stop taking medication, this record does not provide substantial evidence to support the ALJ's decision to find Dr. Uhl's marked limitations inconsistent with Plaintiff's "sporadic" mental-health treatment.

9.    <u>Substantial evidence does not support the ALJ's finding that Dr. Uhl's marked limitations are inconsistent with the cited activities of daily living.</u>

The ALJ found Plaintiff's activities of daily living inconsistent with Dr. Uhl's marked limitations. The cited activities include Plaintiff's ability to raise her son, take care of pets, attend to personal care, prepare meals for herself and her son, perform household chores such as dishes and mopping, use public transportation, shop in stores, socialize with others in person and over the phone, attend group therapy, drive a friend's car, count change, pay bills, handle a checking and savings

1  account, do crafts, write, watch television, work on a screen play, pet sit for friends,

2  make art, write an autobiography, and look into taking business classes to support

3  her goal of screenwriting.

4       When assessing whether a medical opinion is consistent with the

5  longitudinal record, the ALJ may consider whether the opined limitations are

6  consistent with the claimant's level of activity.[95] Yet, an ALJ must appreciate that

7  "many home activities are not easily transferable to what may be the more grueling

8  environment of the workplace."[96]

9       Here, Dr. Uhl's marked limitations pertain to Plaintiff's ability to learn new

10  tasks, adapt to changes, make simple work-related decisions, communicate and

11  perform effectively, maintain appropriate behavior, complete a normal

---

14  [95] 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (comparing the medical opinion with

15  the evidence from nonmedical sources); *see also Rollins v. Massanari*, 261 F.3d 853,

16  856 (9th Cir. 2001) (finding claimant's raising of two young children and

17  maintaining a household inconsistent with the medical source's opinion); *Fair v.*

18  *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

19  [96] *See Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017) (recognizing that the

20  fact the claimant "could participate in some daily activities does not contradict the

21  evidence of otherwise severe problems that she encountered in her daily life during

22  the relevant period").

workday/workweek, and set realistic goals and plan independently.[97] Plaintiff argues that the ALJ did not consider that she has panic and anxiety attacks when she goes shopping, her social interactions frequently lead to conflicts, and that when she attended group therapy she was triggered by other participants and her behaviors triggered others. For instance, her Adult Function Report lists that although she goes to a store about three times a week she goes with her son and tries to be "in and out" of the store.[98]

The Court agrees that the ALJ did not explain how these activities are inconsistent with Plaintiff's pace and social-interaction difficulties as opined by Dr. Uhl. Many of the cited activities relate to cognitive abilities rather than social-interaction abilities, such as counting change, paying bills, handling a checking and savings account, doing arts and crafts, watching television, and working on a screenplay or an autobiography. As to Plaintiff's use of public transportation, shopping in stores, and attending group therapy, Plaintiff relayed she often has anxiety, panic attacks, or social difficulties when doing these activities. For instance, an objective of therapy was to help her develop the ability to go outside of her house other than when she needs to go shopping or to a medical appointment.[99] Plaintiff reported to her therapist that she yelled at a fellow male customer at a

---

[97] AR 360.

[98] AR 265.

[99] See, e.g., AR 466, 469, 472.

DISPOSITIVE ORDER - 29

grocery store to leave her alone.[100] In addition, a therapy note stated, "[Client] shares Support Center Staff are concerned she also has Dissociative Identity Disorder do [sic] to behaviors she exhibits during groups."[101] Another note stated, "We discussed possibility of joining anxiety support group when one is available,"[102] but later Plaintiff reported deciding not to continue with support groups because they "trigger" her.[103]

Treatment records reflect that her therapist recommended that Plaintiff engage in arts and crafts to relieve stress, regain emotional calmness, and decrease and/or prevent disassociation.[104] A behavioral health discharge summary stated:

> Pt is highly creative and used this as a primary coping tool including working on a screenplay. Pt identified strengths from intake included: "I have no filter, I think that is a strength. I'm not afraid of upsetting people with what I say because what I say comes from a pure place. I try to be the light goddess my mother hallucinated I would be.[105]

---

[100] AR 788.

[101] AR 392.

[102] AR 465

[103] AR 886.

[104] *See, e.g.,* AR 426–27, 429–30, 465, 472, 487–88, 493, 1020.

[105] AR 793.

Moreover, there is no indication that Plaintiff completed a screenplay or an autobiography or took any classes to facilitate these stated goals. In addition, the therapy notes reflect that Plaintiff spent time with animals to reduce stress.[106]

Although Plaintiff was generally the primary caretaker for her son, Plaintiff's son was in foster care for a short period, she had to address complaints made to CPS by her sister, and later she moved to Nevada in hopes that extended family could assist her with his care.[107] During a therapy session, the therapist noted that Plaintiff "was affectionate with her son although she did not filter her dialogue or emotions for a 5-year-old in the room."[108] And other therapy session records note that Plaintiff's emotional dysregulation impacts her son.[109]

Substantial evidence is lacking to support the ALJ's finding that Dr. Uhl's marked limitations are inconsistent with Plaintiff's activities.

10.    <u>Summary</u>

The ALJ's assessment of Dr. Uhl's marked limitations relied too heavily on Plaintiff's cessation of psychotropic medication without considering whether this cessation was due to medication side-effects or Plaintiff's relocations or impaired insight caused by her mental impairments. This error impacted the ALJ's

---

[106] AR 780.

[107] AR 395, 400, 948, 954, 1018.

[108] AR 560.

[109] AR 884–87.

evaluation of the longitudinal treatment record and Plaintiff's activities, causing the ALJ to find Plaintiff's treatment sporadic and conservative and that it showed improvement to an extent that Plaintiff could sustain work if she remained compliant with her psychotropic medications. These errors consequentially resulted in the ALJ finding that Dr. Uhl's opinion was unsupported by and inconsistent with the record.

**B.   Symptom Reports: Plaintiff establishes consequential error.**

Plaintiff argues the ALJ failed to provide specific, clear, and convincing reasons supported by substantial evidence to discount her symptom reports. In response, the Commissioner argues the ALJ's findings are adequately supported by reason and substantial evidence. As is discussed below, the ALJ failed to provide a rationale clear enough to convince the reviewing court that Plaintiff's symptom reports should be discounted.

1.   Standard

The ALJ must identify what symptom claims are being discounted and clearly and convincingly explain the rationale for discounting the symptoms with supporting citation to evidence.[110] This requires the ALJ to "show his [or her] work" and provide a "rationale . . . clear enough that it has the power to convince"

---

[110] 20 C.F.R. §§ 404.1529(c), 416.929(c); *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022); *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); Soc. Sec. Rlg. (SSR) 16-3p, 2016 WL 1119029, at *7.

the reviewing court.[111] Factors the ALJ may consider when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms include: 1) the objective medical evidence, 2) daily activities; 3) the location, duration, frequency, and intensity of pain or other symptoms; 4) factors that precipitate and aggravate the symptoms; 5) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; 6) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; and 7) any non-treatment measures the claimant uses or has used to relieve pain or other symptoms.[112]

### 2. The ALJ's Findings

The ALJ found Plaintiff's statements about the intensity, persistence, and limiting effect of her symptoms were not entirely consistent with the medical evidence and other evidence in the record, specifically that Plaintiff's "symptoms were amenable to routine and conservative treatment and did not require extensive further services," Plaintiff "endorsed the ability to perform a range of daily activities that suggests at least somewhat greater abilities than generally alleged," and Plaintiff's statements to a psychiatric nurse practitioner suggested

---

[111] *Smartt*, 53 F.4th at 499 (alteration added).

[112] 20 C.F.R. § 404.1529(c)(2), (3). *See also* 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective medical evidence (2019).

1 that Plaintiff "was seeking mental health treatment in order to generate evidence"

2 to support her disability application.[113]

3     3.    The ALJ failed to provide a rationale clear enough to convince the

4         Court that Plaintiff's course of and response to treatment were

5         inconsistent with Plaintiff's reported symptoms.

6     Objective medical evidence—signs, laboratory findings, or both—is a

7 relevant factor for the ALJ to consider when assessing a claimant's symptoms.[114]

8 "Signs" is defined as:

9     one or more anatomical, physiological, or psychological abnormalities
     that can be observed, apart from [the claimant's] statements
10    (symptoms). Signs must be shown by medically clinical diagnostic
     techniques. Psychiatric signs are medically demonstrable phenomena
11    that indicate specific psychological abnormalities, e.g., abnormalities
     of behavior, mood, thought, memory, orientation, development, or
12    perception, and must also be shown by observable facts that can be
     medically described and evaluated.[115]

13 While an ALJ may not "reject a claimant's subjective complaints based *solely* on

14

15 lack of medical evidence to *fully corroborate*" the complaint, the ALJ may discount

16 subjective complaints that are *inconsistent* with the objective medical evidence, so

17

18 ─────────────

[113] AR 25.

19

[114] 20 C.F.R. §§ 404.1502(f), (g), 416.902(k, (l); *Smolen v. Chater*, 80 F.3d 1273,

20

1284 (9th Cir. 1996); 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective

21

medical evidence (2019).

22

[115] *Id.* §§ 404.1502(g), 416.902(l).

23

long as the ALJ explains why the objective medical findings are inconsistent with the claimant's complaints.[116] When considering the objective medical findings, a claimant's improvement with treatment is "an important indicator of the intensity and persistence of . . . symptoms."[117] Symptom improvement, however, must be weighed within the context of an "overall diagnostic picture," particularly for mental-disorder symptoms, which often wax and wane.[118] Reports of improvement "must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms," as well as with an awareness that "improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace."[119]

---

[116] *Smartt*, 53 F.4th at 498 (quoting *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (emphasis added in *Smartt*)).

[117] 20 C.F.R. §§ 416.929(c)(3), 404.1529(c)(3). *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

[118] *Holohan v. Massanari*, 246 F.3d1195, 1205 (9th Cir. 2001); *see also Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) ("Occasional symptom-free periods . . . are not inconsistent with disability.").

[119] *Garrison*, 759 F.3d at 1017 (cleaned up).

1    Here, after comparing Plaintiff's reported symptoms to the objective medical

2    evidence, the ALJ found that Plaintiff's symptoms were lessened by "routine and

3    conservative treatment," highlighting that Plaintiff was only hospitalized once for

4    psychiatric reasons, and that Plaintiff had participated in "sometimes sporadic

5    mental health treatment" and "repeatedly chose[] to stop taking her medication."[120]

6        As discussed above, the ALJ's finding that Plaintiff's mental-health

7    treatment was sporadic and conservative is not supported by substantial evidence.

8    Likewise, the ALJ focused on the medical records, which contained Plaintiff's

9    reports of doing "okay"/better and/or normal mental-status findings, without

10    considering the overall context of these reported or observed improvements.[121]

11    Notably, the last medical record from March 2023 reflects that, notwithstanding

12    consistent medication compliance for the preceding nine-month period, Plaintiff

---

[120]  AR 24–25.

[121]  *See Ghanim*, 763 F.3d at 1164 (recognizing that context is crucial when interpreting medical records); *Garrison*, 759 F.3d at 1017 (requiring the ALJ to carefully consider "indications in the medical record that [the claimant] was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity") (quoting *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001)).

presented with a labile mood that rapidly fluctuated during the appointment and an anxious, sad, tearful affect with suicidal ideation.[122]

Therefore, absent a clear discussion about whether Plaintiff's medication noncompliance was impacted by medication side-effects or Plaintiff's mental impairments or relocations, the ALJ's analysis of the record fails to convince the Court that Plaintiff's relief was lasting and was of the type and degree that was truly at odds with Plaintiff's reported symptoms.[123] Substantial evidence does not support the ALJ's finding that Plaintiff's reported symptoms were inconsistent with the objective medical evidence.

4.      Substantial evidence does not support the ALJ's finding that Plaintiff's daily activities are inconsistent with her reported symptoms.

The ALJ found that Plaintiff's ability to perform a range of daily activities was inconsistent with her alleged symptoms.[124] Like was discussed above, the ALJ's analysis of Plaintiff's activities fails to convince the Court that Plaintiff's

---

[122] AR 1053–54

[123] *See Garrison*, 759 F.3d at 1017–18; *Reddick v. Chater*, 157 F.3d 715, 723 (9th Cir. 1998) (recognizing that an ALJ must account for the context of the claimant's prior report as well as the nature of his impairment and its symptoms).

[124] AR 25 (internal citations to the record omitted).

reported symptoms are inconsistent with her activities of daily living.[125] The ALJ did not consider whether the nature of the activities allowed for breaks in pace or separation from others. The ALJ also found Plaintiff's ability to travel to Nevada in early January 2019 and ability to relocate multiple times suggested that she overstated her symptoms. However, the record contains very little facts about Plaintiff's travel to Nevada, which appears to have been to visit her boyfriend to assess whether she and her son would move there.[126] There is no information as to whether Plaintiff drove or flew or rode a bus, the duration of the trip, or with whom she interacted other than her boyfriend. Without such or similar information, the ALJ's reliance on Plaintiff's report to her therapist that she had a very positive trip to Nevada does not afford substantial evidence to discount her claims that she struggles with anxiety, panic attacks, hallucinations, nightmares, and irritability. Moreover, the record reflects that Plaintiff's relocations were generally due to her housing instability or desire to move away from an abuser or neighbors with whom she had conflicts.[127] The ALJ fails to convincingly explain why these moves should be held against Plaintiff when assessing the credibility of her symptoms.

---

[125] *See Garrison*, 759 F.3d at 1016; *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

[126] AR 308–09.

[127] *See, e.g.*, AR 308, 312, 317, 333, 398, 409, 420, 492, 570, 572–73, 619, 622, 625, 630–31, 633, 661, 793, 899, 904.

5.    <u>The ALJ did not clearly and convincingly explain that Plaintiff sought mental-health treatment solely to make a stronger case for disability benefits.</u>

An ALJ may discount a claimant's symptom reports if the claimant tends to exaggerate or engage in conduct to manipulate the disability-determination process.[128] Here, the ALJ discounted Plaintiff's reported symptoms because during her initial visit with the psychiatric nurse practitioner in March 2018 Plaintiff:

> reported that her therapist had encouraged her to schedule the appointment in order to help her make a stronger cause for disability benefits. This suggests that the claimant was seeking mental health treatment in order to generate evidence for this application, rather than in a genuine attempt to obtain relief from her allegedly disabling symptoms.[129]

In support of this finding, the ALJ cited to Exhibit 5F/51. This is a March 6, 2018 initial-evaluation record, which notes Plaintiff's presenting problem as, "Lives with her 3yo son, unemployed, [r]eports trauma history since a baby. Reports PTSD symptoms interferes with her daily life, cannot hold a job for a long time, and has

---

[128] 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); *Smolen*, 80 F.3d at 1284 (The ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid.").

[129] AR 25 (citing AR 665 (Exhibit 5F/51)).

unhealthy relationships."[130] This treatment note does not stand for the proposition the ALJ states.

Yet, the record from the October 19, 2020 initial psychiatric evaluation identifies the presenting problem as: "I know that meds are recommended for me. Lisa [Orr, LMHC, her therapist,] just wanted me to talk to someone who is a psychiatrist to help me get disability which I've been trying to do for 3 years now."[131] This record does not reflect improper motivation or lack of candor by Plaintiff. Instead, the record reflects that Plaintiff was candid with the evaluator as to the purpose of the October 2020 psychiatric evaluation: an evaluation that was mere days after Plaintiff presented with a panic attack, frequent crying, and a flat affect and thus the treating provider made an urgent referral to collaborative care.[132] Plaintiff consistently advised evaluators and treating providers that she believed she was unable to work due to her mental impairments and often discussed the steps she was taking to apply for disability or other benefits.[133]

---

[130] AR 664.

[131] AR 645 (Exhibit 5F/31).

[132] AR 653–55.

[133] *See, e.g.*, AR 460 (discussing with her therapist the procedural steps she is doing to apply for disability); AR 664 ("Reports PTSD symptoms interferes with her daily life, cannot hold a job for a long time, and has unhealthy relationships); AR 727 ("Working for 3 yrs to get on disability"); AR 916 ("reported she is also receiving

1    Plaintiff was upfront that she believes her mental-health symptoms prevent her

2    from working, and she sought assistance from her providers to support her

3    disability application and to receive other benefits as well for her and her son.

4    Plaintiff should not be penalized for advising an evaluator that she was hoping the

5    evaluation would assist with her disability application.

6    **C.    Other Steps: The ALJ must reevaluate on remand.**

7         Because the ALJ erred when evaluating Dr. Uhl's opined marked limitations

8    and Plaintiff's symptom reports and these errors impacted the ALJ's sequential

9    analysis, the Court does not analyze Plaintiff's remaining RFC argument.

10        The record contains conflicting evidence about whether Plaintiff had good-

11   cause reasons for discontinuing her mental-health medication at times; therefore,

12   further administrative proceedings are necessary to determine if Plaintiff qualifies

13   for disability benefits. On remand, if necessary, the ALJ is to consider obtaining

14   either an updated consultative psychological examination or testimony from a

15   psychologist to address not only the psychologist's opinion as to the level and

16   nature of Plaintiff's non-exertional limitations but also whether Plaintiff's mental-

17   _____

18   DSHS assistance; food stamps and TANF and that she is in the process of applying

19   for disability); AR 938 ("She is actively pursuing help from local resources

20   regarding the homelessness and is reaching for help by coming in today for her

21   mental health issues and willing to go to OB HC for her appointment today at

22   noon.").

23

health impairments, medication side-effects, or relocations impacted her decision to discontinue her medication.[134]

### IV.    Conclusion

Plaintiff establishes the ALJ erred. The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process.

Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)**.

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and 10**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this _21st_ day of May 2024.

_Edward F. Shea_

EDWARD F. SHEA
Senior United States District Judge

---

[134] *See Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (recognizing that the ALJ has a special duty to develop the record fully and fairly when necessary).